UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD WESLEY, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JASON DOMBROWSKI and | : | |
| DANIEL ADOLFSON, | : | |
| Defendants. | : | No.  03-4137 |

MEMORANDUM AND ORDER

PRATTER, J.                                                   AUGUST 31, 2007

        Ronald Wesley, an inmate in the custody of the Pennsylvania Department of Corrections

("DOC") and incarcerated at the State Correctional Institution at Graterford ("Graterford"),

initiated suit pursuant to 42 U.S.C. § 1983 and state tort law.  Mr. Wesley initially alleged

multiple causes of action against a number of defendants, including certain corrections officers

and medical staff at Graterford, but his only remaining claim is that corrections officers Jason

Dombroski[1] and Daniel Adolfson used excessive force while transporting him from Graterford's

dispensary back to his cell on August 6, 2001, in violation of the Cruel and Unusual Punishment

Clause of the Eighth Amendment.  The Defendants now move for summary judgment, arguing

that (1) no reasonable jury could find that they used excessive force at any time during the

incident in question, and (2) they are entitled to qualified immunity.[2]  Mr. Wesley opposes the

---

        [1] Mr. Dombroski's name is spelled incorrectly as "Dombrowski" in the caption of this
case.

        [2] In a June 28, 2004 Memorandum, the late Honorable James McGirr Kelly dismissed all
of Mr. Wesley's claims except the excessive force claim.  Wesley v. Dombroski, No. 03-4137,
2004 U.S. Dist. LEXIS 11938 (E.D. Pa. June 28, 2004).  Following the resolution of the motion
to dismiss, discovery commenced, and the remaining defendants, Officers Dombroski and
Adolfson, moved for summary judgment.  Shortly thereafter, Judge McGirr Kelly passed away,

Defendants' motion on both grounds.  The Court heard oral argument on Defendants' motion on June 12, 2007.

The record evidence in this case largely consists of the testimony of the parties, which often conflicts.  Nevertheless, after carefully reviewing the record and considering the nature of the contrasting testimony, the Court concludes that summary judgment is appropriate.  Viewing the evidence in Mr. Wesley's favor, as the Court must at the summary judgment phase, for the reasons delineated below the Defendants' Motion for Summary Judgment will be granted.

**FACTUAL BACKGROUND**

The following facts are undisputed unless otherwise indicated.  Where there is a dispute, the Court considers those facts in the light most favorable to Mr. Wesley.  Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 267 (3d Cir. 2001).

In April 2001, while incarcerated at Graterford, Mr. Wesley was charged in a prison disciplinary action and found guilty of misconduct for threatening a Graterford corrections officer, using abusive language, and disobeying an order.  For punishment, Mr. Wesley was removed from the general prison population and placed in solitary confinement in Graterford's maximum custody area, the Restricted Housing Unit ("RHU").  (Wesley Dep. 16:17-22, 17:1-3, Nov. 30, 2004.)[3]  While Mr. Wesley resided in the RHU, he remained confined to his cell for

_____

and this case was transferred to this Court's docket.  The Court instructed the Clerk of the Court to appoint counsel for Mr. Wesley.  On March 23, 2006, counsel was appointed.  The Court then dismissed the Defendants' initial motion for summary judgment without prejudice and permitted the parties to engage in additional discovery.  The instant motion for summary judgment followed.

[3] Throughout his 31-month stay in the RHU, Mr. Wesley was charged with roughly twelve additional incidents of misconduct.  (Wesley Dep. 18:14-20, 79:19-21.)

close to 24 hours per day.  (Wesley Dep. 20:2-7.)  During this period, he was not active in the RHU yard; instead, he emerged from his cell only for showers and medical appointments. (Wesley Dep. 20:6-7, 20:20-21:9.)

Mr. Wesley suffers from chronic asthma, chronic Hepatitis C, and other ailments.  (Pl. Statement of Facts ¶ 7.)  At the time he was placed in the RHU, Mr. Wesley was undergoing a six-month course of interferon treatment, which he claims is similar to chemotherapy, for his Hepatitis C condition.  (Pl. Statement of Facts ¶ 8 and n.2.)  Mr. Wesley claims that the interferon treatment left him "bedridden," "weak and . . . exhausted."  (Wesley Dep. 20:22-21:9.) He devoted most of his days to resting and developing his legal paperwork for other pending litigation.  (Wesley Dep. 20:22-21:9.)

Because Mr. Wesley's medical conditions require continuous care, he was enrolled in Graterford's chronic care clinic.  (Wesley Dep. 22:5-12.)  Under this program, he was scheduled to visit the ear, nose and throat specialist for his asthma every three months, and the internal medicine doctor for his liver condition every six months.  (Pl. Statement of Facts ¶ 10 and n. 3.) Mr. Wesley asserts that Graterford officials stopped taking him to his regularly scheduled appointments once he entered the RHU.  (Pl. Statement of Facts ¶ 10.)

In July 2001, Mr. Wesley submitted a sick call slip documenting stomach pressure, swelling, and pain, all of which he attributed to the interferon treatment and/or medication for his Hepatitis C illness.  (Wesley Dep. 42:12-13, 44:23-45:1.)  A physician's assistant responded periodically to Mr. Wesley's sick call by conducting verbal examinations while standing outside of his cell; the physician assistant did not prescribe any treatment.  (Wesley Dep. 44:6-11.)

On August 3, 2001, three days before the incident at issue here, Mr. Wesley was

scheduled to see an internal medicine doctor for his regularly scheduled, six-month liver

evaluation.  (Wesley Dep. 24:17-19.)  According to Graterford's policy, RHU inmates under the

highest custody level, such as Mr. Wesley, must be handcuffed and escorted to any medical

appointment by corrections officers.  (Def. Statement of Facts ¶ 17).[4]  Graterford officials did not

escort Mr. Wesley to his August 3, 2001 appointment; consequently, Mr. Wesley did not attend

this appointment.  (Wesley Dep. 24:17-21, 25:1-7.)

On August 6, 2001, Graterford officials notified Mr. Wesley of his pulmonary

appointment in the asthma clinic at the Graterford dispensary.  At approximately 1:00 p.m.,

Officers Dombroski and Adolfson met Mr. Wesley at his cell in the RHU.  In accordance with

Graterford policy, Defendants strip-searched Mr. Wesley and handcuffed his hands behind his

back.  (Wesley Dep. 29:11-12.)[5]  The Defendants then proceeded to escort Mr. Wesley to his

appointment.

The Graterford dispensary is located in a separate building approximately a quarter mile

from the RHU.  (Wesley Dep. 37:1-2.)  At the correction officers' discretion, an inmate and his

---

[4] In contrast, inmates in the general population are given a pass and permitted to walk
unescorted to the dispensary. (Stanishefski Decl. ¶ 6.)

[5] For frame of reference, Mr. Wesley is five feet, nine inches tall, weighed approximately
190 pounds, and was 53 years old in August 2001.  (Wesley Dep. 5:10-16.)  Officer Dombroski
is five feet, seven inches tall, weighed "maybe a little less than" 160 pounds, and was 30 years
old in August 2001.  (Dombroski Dep. 9:11-15, June 13, 2006.)  Officer Adolfson is six feet, two
inches tall, weighed approximately 280 pounds, and was 33 years old in August 2001.  (Adolfson
Dep. 6:12-16, Aug. 7, 2006.)

Mr. Wesley testified that he had never met either of the Defendants prior to August 6,
2001.  (Wesley Dep. 19:8-12, 23:3-7.)  Officer Adolfson testified that he had no prior
relationship with Mr. Wesley (Adolfson Dep. 33:14-17), while Officer Dombroski testified that
he was familiar with Mr. Wesley.  (Dombroski Dep. 22:10-20.)  At their depositions for this
case, the Defendants characterized Mr. Wesley as a cooperative, respectful inmate who generally
keeps to himself.  (Adolfson Dep. 34:23-24, 35:11-14; Dombroski Dep. 22:17-20, 48:8-9.)

escorts may either walk or ride in a prison van to the dispensary.  Mr. Wesley testified that

because he had not been outdoors in some time, and because it was a warm August day, he opted

to walk the quarter-mile trek to the dispensary under the Defendants' supervision.  (Wesley Dep.

36:19-37:10.)  Mr. Wesley walked at his normal pace, which he describes as slow, and did not

require assistance from the Defendants in reaching the dispensary.  (Wesley Dep. 34:12, 37:1-

14.)[6]

Security is particularly sensitive in the medical facilities at Graterford because inmates

being treated may have access to medical instruments and medication, and doctors and nurses

who are not employed by the DOC may be present.  (Def. Statement of Facts ¶ 62; Pl. Statement

of Facts ¶ 62; Stanishefski Decl. ¶ 4.)  Therefore, extra precautionary measures are in place for

the treatment of RHU inmates to minimize the time an RHU inmate spends in the dispensary.

(Def. Statement of Facts ¶ 32; Pl. Statement of Facts ¶ 32.)  For security reasons, RHU inmates

receive priority treatment in the dispensary.  (Def. Statement of Facts ¶¶ 29-30; Stanishefski

Decl. ¶ 6.)[7]   RHU inmates are examined before other general population prisoners awaiting

---

[6] Mr. Wesley claims that he felt exhausted and dizzy following the walk upon arriving at
the dispensary.  (Wesley Dep. 37:11-14.)  However, Mr. Wesley did not inform the Defendants
that he felt tired.  During the walk to the dispensary Mr. Wesley exchanged pleasantries with
other inmates and did not verbalize physical discomfort at any point. (Wesley Dep. 38:1-14.)

[7] According to the Defendants, another reason RHU inmates receive more attentive
treatment is because many strive to prolong their stays in the dispensary so as to lessen their time
spent in solitary confinement.  (Stanishefski Decl. ¶ 6.)  The Defendants claim that inmates who
feign injury or illness in order to prolong their stay in the dispensary are a frequent problem,
(Def. Statement of Facts ¶ 63), and that any inmate who objects to returning to his cell is
removed from the dispensary as quickly as possible, Def. Statement of Facts ¶ 64).
Mr. Wesley was aware that RHU inmates receive priority treatment at the dispensary.  He
stated that "we take priority over all of the other guys in general [population] who are waiting.  In
other words, we don't go into the back of the line, we go in front of everyone."  (Wesley Dep.
38:20-23.)

medical attention, and are returned to their cells immediately after their appointments.  (Def. Statement of Facts ¶¶ 33-34; Stanishefski Decl. ¶ 6.)[8]

When Mr. Wesley arrived at the dispensary, he and Officer Adolfson immediately entered the examination room.  Officer Dombroski did not accompany Mr. Wesley into the examination room; he left the immediate vicinity to make arrangements related to another inmate.  A pulmonary physician[9] then examined Mr. Wesley for approximately 10 to 15 minutes related to his asthma condition.  (Wesley Dep. 40:1-5.)

During his examination, Mr. Wesley decided that because it was his "first chance to get up to the dispensary," he would make what he termed an "onsite emergency complaint" for his internal ailment even though he knew that he was only being escorted to the dispensary for a pulmonary appointment.  (Wesley Dep. 42:2-4, 42:23-24, 45:13-17, 46:19-22.)  The pulmonary physician refused to treat Mr. Wesley with respect to his internal ailment, and recommended that Mr. Wesley discuss his symptoms with an internal medicine doctor.  (Wesley Dep. 46:23-24.)

After his pulmonary examination was completed, Mr. Wesley, escorted by Officer Adolfson, stood and walked out of the examination room without assistance, and sat in a chair in the hallway outside of the clinic area.  (Wesley Dep. 48:1-22.)[10]  Mr. Wesley did not have any

---

[8] Mr. Wesley appears not to dispute the fact that Graterford employs extra precautionary measures for the treatment of RHU inmates (Pl. Statement of Facts ¶ 32), yet he disputes Defendants' explanations for why such measures should apply to him, because, he claims, he "had never before caused a problem in the medical area" (Pl. Statement of Facts ¶ 30), and he "had no interest in prolonging his stay" on August 6.  (Pl. Statement of Facts ¶ 31.)

[9] Mr. Wesley did not recall whether he was examined by Dr. Josselson or Dr. Drizen, both of whom are pulmonary doctors.  (Wesley Dep. 40:8-10.)

[10] Mr. Wesley testified that he sat down because he "was telling the doctor how weak and tired" he was.  (Wesley Dep. 52:1-3.)  At his deposition, Officer Adolfson stated that he believed

other medical appointments scheduled for August 6.  (Adolfson Dep. 50:23-51:1.)  Mr. Wesley

and Officer Adolfson waited for Officer Dombroski to return.  (Wesley Dep. 51:20-22; Adolfson

Dep. 50:20-22.)  At this time, Mr. Wesley's hands were still handcuffed behind his back.

(Adolfson Dep. 57:23.)  Officer Adolfson stood at arm's length from Mr. Wesley while Mr.

Wesley was seated.  (Wesley Dep. 48:18-22.)

 While Mr. Wesley was seated in the hallway of the dispensary, he saw Nurse Peggy

Beauchesne, whom he knew from previous encounters at Graterford.  Mr. Wesley explained to

Nurse Beauchesne that he needed to see Dr. Iaccarino, an internist, due to his stomach pain.

(Wesley Dep. 49:4-7, 52:12-14.)  Mr. Wesley explained that he had missed an appointment on

August 3, and that he needed to be seen immediately.  (Wesley Dep. 52:14-20.)  Nurse

Beauchesne told Mr. Wesley that she would tell Dr. Iaccarino that Mr. Wesley wanted to see

him.  (Wesley Dep. 52:20-21, 54:3-9.)  Nurse Beauchesne then entered Dr. Iaccarino's office and

presumably relayed Mr. Wesley's concern.  (Wesley Dep. 54:15-21.)

 Officer Dombroski returned as Nurse Beauchesne entered Dr. Iaccarino's office.  (Wesley

Dep. 54:18-21.)  Officer Dombroski, assuming that Mr. Wesley's appointment was over and that

he was ready to leave the dispensary, indicated that it was time to leave.  (Wesley Dep. 54:23-

55:4.)  Mr. Wesley then informed Officer Dombroski that Nurse Beauchesne was relaying a

message to Dr. Iaccarino and that he needed to await her return.  (Wesley Dep. 55:6-10.)

 Nurse Beauchesne returned soon after and informed Mr. Wesley that Dr. Iaccarino would

---

Mr. Wesley sat down because he was complaining about needing to see a doctor about his
stomach pain.  (Adolfson Dep. 49:3-10, 51:9.)  He stated that Mr. Wesley "didn't say much"
while he was sitting, other than talk "about his stomach problem or something."  (Adolfson Dep.
53:1-2.)

not see him at that time, but would see him on August 28, 2001. (Wesley Dep. 56:3-5.) Mr.

Wesley then pleaded with Nurse Beauchesne to communicate his stomach pain to Dr. Iaccarino.

(Wesley Dep. 56:18-19.)[11]

After it became clear that Dr. Iaccarino would not examine Mr. Wesley at that time,

Officer Dombroski told Mr. Wesley that his appointment was over, that it was time to go

(Wesley Dep. 59:8), and ordered him to get up from his chair. (Dombroski Dep. 32:7-8.) Mr.

Wesley claims that his legs "felt so heavy" that he was unable to stand. (Wesley Dep. 59:17-20.)

He claims that he told the Defendants that he could not move, and that Officer Dombroski

responded by accusing him of lying and "faking" his inability to walk. (Wesley Dep. 59:20-24,

60:1-4.) He claims that Officer Dombroski said "something to the effect that, you walked down

here and you're going to walk back or else I'm going to drag you." (Wesley Dep. 60:4-6.)[12]

Mr. Wesley claims that the Defendants then grabbed him under the armpits and lifted him

to his feet. (Wesley Dep. 60:18-19.)[13] He claims that he still could not move his legs, but that he

saw a wheelchair close by and pleaded with the Defendants to let him use the wheelchair.

(Wesley Dep. 60:23-61:8.) Defendants refused to provide Mr. Wesley with a wheelchair.

---

[11] Defendants claim that when Dr. Iaccarino refused to treat Mr. Wesley, he became "irate," "enraged, loud, disruptive"; he "demanded to see a doctor" and claimed that he was dying. (Dombroski Dep. 32:2-4; Adolfson Dep. 58:7-12.) In his Complaint, Mr. Wesley states that after Officer Dombroski ordered him to stand and depart the dispensary, he began "hollering out towards the doctor's office." (Compl. 10 ¶ 10.)

[12] Defendants deny that Officer Dombroski threatened to drag Mr. Wesley back to his cell. (Dombroski Dep. 33:23-34:2; Adolfson Dep. 62:19-23.)

[13] Notably, in the grievance he filed on August 11, 2001, Mr. Wesley stated that the Defendants "helped stand [him] to [his] feet." (Pl. Mem. Opp'n Ex. G at 1.) Mr. Wesley does not suggest that his choice of descriptive language in the grievance papers was chosen for sarcastic understatement, and the Court will not so interpret it.

Instead, the Defendants proceeded to drag him – each of them holding onto one of Mr. Wesley's

arms – away from the examination rooms, through the dispensary waiting area, and into the main

administrative corridor.  (Wesley Dep. 61:5-8, 61:22-62:13.)  Mr. Wesley claims that he was

dragged in a manner such that his feet skidded along the ground.  (Wesley Dep. 62:9-13.)[14]  He

estimates this distance to have been approximately 25 feet.  (Wesley Dep. 62:1.)

The main administrative corridor at Graterford is where inmates and corrections officers

enter and exit the dispensary, and where corrections officers often gather to receive assignments

or to change shifts.  (Wesley Dep. 63:8-12.)  Mr. Wesley suspected that other corrections officers

were likely to be gathered in the main corridor.  (Wesley Dep. 63:9-12.)[15]  Once he and the

Defendants exited the dispensary and reached the main corridor, Mr. Wesley spotted additional

corrections officers and began "screaming and hollering, help, help, help."  (Wesley Dep. 63:8-

---

[14] While Mr. Wesley claims that the Defendants "dragged" him out of the dispensary and into the main corridor, both Defendants testified that Mr. Wesley walked this distance of his own volition.  Officer Dombroski claims that after he ordered Mr. Wesley to stand and he "refused" (Dombroski Dep. 32:8), he told Officer Adolfson to grab Mr. Wesley by the arm.  He and Officer Adolfson each grabbed one of Mr. Wesley's arms and stood him to his feet.  (Dombroski Dep. 32:8-10; Adolfson Dep. 57:20-58:1.)  Officer Dombroski claims that after Mr. Wesley was on his feet, he stated that he could walk and did not need to be held, and that he walked on his own from the dispensary out into the main corridor while the Defendants each held one of his arms at the elbow.  (Dombroski Dep. 32:11-13, 33:22, 34:1-24.)

Officer Adolfson's testimony at his deposition largely corroborates Officer Dombroski's account.  He stated that Officer Dombroski ordered him to grab Mr. Wesley by the arm and to pick him up out of the chair.  (Adolfson Dep. 57:20-58:1.)  He claims that once Mr. Wesley was on his feet, Mr. Wesley he stated that he could walk on his own (Adolfson Dep. 58:1), and that he proceeded to walk on his own.  Officer Adolfson stated that "Inmate Wesley did not have any problems walking out of the Dispensary." (Adolfson Dep. 58:4, 58:10-23.)

[15] Mr. Wesley testified that once he reached the main corridor he knew that other corrections officers would be present.  (Wesley Dep. 63:9-12.)  He stated, "[s]o  when we got to the main corridor, that's when I knew that there were other officers, because they generally be hanging around outside of the day captain waiting for an assignment."  (Wesley Dep. 63:8-12.)

13.)  Mr. Wesley claims that approximately six corrections officers quickly responded to his cries, but that Officer Dombroski assured them that Mr. Wesley was not hurt and was faking an inability to walk.  (Wesley Dep. 64:17-22.)

At this point, it is unclear whether Officer Adolfson remained as part of the unit that escorted Mr. Wesley from the main corridor to his cell at the RHU.  The Defendants both testified that Officer Adolfson was relieved from duty in the main corridor, and did not have any further contact with Mr. Wesley on that day.  (Adolfson Dep. 67:23-68:7, 69:21-24, 70:4-12, 72:14-17; Dombroski Dep. 37:17-38:21, 105:18-21.)  Mr. Wesley's testimony, although far from expressing absolute certainty, indicates that Officer Adolfson remained with the escort past the incident in the main corridor.[16]

_____

[16] Officer Adolfson testified that at some point after he and Officer Dombroski escorted Mr. Wesley out of the dispensary into the main corridor, another officer relieved him from duty. (Adolfson Dep. 67:23-68:7.)  Officer Adolfson testified that another officer took over for him at the main corridor before the escort reached the loading dock.  (Adolfson Dep. 69:21-24, 70:4-12, 72:14-17.)  Officer Dombroski also testified that Officer Adolfson was relieved from duty in the main corridor, and that he did not escort Mr. Wesley all the way back to the RHU.  (Dombroski Dep. 37:17-38:21, 105:18-21.)

At his deposition, Mr. Wesley stated that each of the Defendants held onto one of his arms as they picked him up and carried him from the main corridor to the loading dock.  (Wesley Dep. 66:21-67:3.)  He acknowledged, however, that a shift change was about to occur and that several guards were in the immediate vicinity.  (Wesley Dep. 67:8-10.)

Mr. Wesley's account of which corrections officers were present after the escort left the main corridor involves several "assumptions."  For example, Mr. Wesley "assumed" Officer Dombroski stood at his right or his left, close to his head, as he lay on the loading dock, but he testified that because he was laying face-down he could not actually see Officer Dombroski. (Wesley Dep. 68:4-10.)  When asked which four guards picked him up off the loading dock, Mr. Wesley testified that "I assume it was the same four guards who had brought me that far," and he specifically states that Officers Dombroski and Adolfson were present.  (Wesley Dep. 69:17-70:1.)  However, Mr. Wesley admits that he gathered that information, at least in part, from a misconduct report that Officer Dombroski filed after Mr. Wesley spit on him.  He states, "On his misconduct report [Officer Dombroski] put four names who were witnesses to the incident and this is why I cited their names.  As you can see, Adolfson, Lewis, Cox, Taylor.  He checked all of those as being involved in the incident, so that's what I assumed."  (Wesley Dep. 69:17-24.)

Accepting Mr. Wesley's version of the facts, the Defendants each held one of Mr. Wesley's elbows while at least two of the additional corrections officers who had responded to his cries grabbed his legs, either at the ankles or the knee, and carried him out of the main corridor, down a maintenance corridor, outside to a loading dock. (Wesley Dep. 66:17-20, 67:21-23.) Defendants describe this method of carrying Mr. Wesley as a "four-man" or "four-on-one" method, whereby four officers each hold onto one of a resistant inmate's arms and legs.[17] Mr. Wesley claims that an unidentified corrections officer stepped on his ankle as the officers tried to grab and lift him off of the ground.[18]

_____

In describing the next phase of the August 6 incident, Mr. Wesley testified that the four officers who carried him to the prison van, and rode with him in the van, included both Defendants and two unidentified officers. He stated that Officers Dombroski and Adolfson were present "because they, I guess according to their procedures, they couldn't leave the escort without probably authority of the captain or somebody." (Wesley Dep. 70:13-17.) He stated that he "believe[d]" that the officer applying weight to his neck and back in the back of the prison van was Officer Adolfson. (Wesley Dep. 71:7-12.)

Notably, however, Mr. Wesley did not testify that he actually saw Officer Adolfson at any point after the escort left the main corridor. He did not testify that he actually saw which corrections officers carried him from the loading dock to the van, or which officer held him down in the van since his head was pressed face-down into the seat cushion.

[17] Mr. Wesley alleges that the Defendants, along with two other corrections officers, transported from the main corridor to the loading dock in a "hog-tie" fashion. (Wesley Dep. 67:11-14.) Specifically, Mr. Wesley claims that the officers bent his legs back to meet his hands as they remained cuffed behind his back. The Defendants dispute Mr. Wesley's characterization of their method as a "hog-tie," and state that they carried him using a "four-man," or "four-on-one approach," whereby one of the four corrections officers each holds onto one arm or one leg in order to carry an inmate who is resisting. (Dombroski Dep. 41:9-42:11.) Officer Dombroski did testify, however, that it would be consistent with this approach to bend an inmates legs towards his hands if the inmate resisted. (Dombroski Dep. 42:7-10.) Officer Dombroski did not recall whether he or the other officers actually bent Mr. Wesley's legs back toward his hands on this date, but stated that Mr. Wesley was resisting in a way such that it would have been proper to do so. (Dombroski Dep. 42:11-43:4.)

[18] It does not appear that the corrections officer who stepped on Mr. Wesley's ankle was either Officer Dombroski or Officer Adolfson. Mr. Wesley testified that each of the Defendants

Once the escort reached the loading dock, Mr. Wesley alleges that the Defendants and two additional corrections officers dropped him face-down on his torso, onto the concrete surface, from approximately one foot off the ground. (Wesley Dep. 67:24-68:3.)[19] Mr. Wesley then laid on his stomach on the loading dock for a short period.[20] Officer Dombroski called for a van to pick up Mr. Wesley and the corrections officers. Mr. Wesley testified that as he was lying on the concrete surface of the loading dock, he gagged and either spit or vomited on Officer Dombroski's pant leg and shoe. (Wesley Dep. 68:10-17.)

At this point, Mr. Wesley claims that Officer Dombroski became angry, and determined to drag him back to the RHU. (Wesley Dep. 69:12-16.) Mr. Wesley claims that the same four corrections officers, including the Defendants, picked him up from the loading dock (Wesley Dep. 69:16-18, 70:3), and carried him using the four-man approach approximately 100 feet down a gravel road, in the direction of the RHU. (Wesley Dep. 70:3-5.) Shortly thereafter, a van arrived, and Mr. Wesley claims that the four escorting officers "tossed" him face-down onto one of the van's long, cushioned seats. (Wesley Dep. 70:9-11, 71:6-12.) Mr. Wesley claims that Officer Adolfson then positioned his hand on the back of Mr. Wesley's neck, and pressed his

---

held one of his arms while at least two other officers attempted to pick him up by his legs. An unidentified officer stepped on Mr. Wesley's ankle while attempting to grab one of his legs. (Wesley Dep. 66:21-67:3.)

[19] Officer Dombroski specifically denies "dropping" Mr. Wesley on the loading dock; he claims that the officers "placed" Mr. Wesley onto the concrete. (Dombroski Dep. 48:15-18, 50:2-6; 110:19-21.)

[20] The DOC expressly prohibits corrections officers from placing inmates on their stomachs while they are handcuffed behind their backs. (See Pl.'s Resp. Opp'n Summ. J. Ex. F, DC-ADM 201 Use of Force Procedure Manual § 2(B)(7).)

knee into the small of Mr. Wesley's back.  (Wesley Dep. 71:6-12).[21]

Upon arriving at the RHU, Mr. Wesley alleges that the Defendants removed him from the van, placed him on his feet, and handed him over to two other corrections officers.  (Wesley Dep. 72:23-73:11.)  These officers then carried Mr. Wesley by his arms and waist "with compassion" back to his cell.  (Wesley Dep. 73:20-22.)  Mr. Wesley had no further contact with the Defendants on that day.

An officer who escorted Mr. Wesley to his cell asked him whether he was all right, needed medical attention, or needed to go to the hospital.  (Wesley Dep. 75:17-21.)  Mr. Wesley declined, claiming that he was too afraid to return to the dispensary.  (Wesley Dep. 75:22-24.)  Instead, Mr. Wesley broke down shaking and crying and "went into shock."  (Wesley Dep. 75:14-17.)  At some point thereafter, Mr. Wesley fell asleep and awoke a few hours later with hand marks on his armpits, swelling in his ankle, soreness in his back, neck, and shoulder, and "throbbing, intense pain" from his waist down.  (Wesley Dep. 76:15-77:1.)

Mr. Wesley did not seek medical attention for his alleged injuries, did not sign up for a sick call at the RHU as he had previously done with respect to his stomach pain, nor did he complain of any such injuries to medical professionals at subsequent appointments.  Mr. Wesley testified that he saw a doctor again within days of the August 6 incident – on either August 11, 14 or 15 – during a sick call related to his internal ailment.  However, Mr Wesley did not mention the injuries that he  allegedly suffered at the hands of the Defendants during the August 6 sick call.  Instead, he testified that he nursed his injuries with "rest."  (Wesley Dep. 77:21-24.)

_____

[21] As noted above, see supra note 16, Defendants claim that Officer Adolfson was no longer part of the escort at this point.

Mr. Wesley followed Graterford's procedures for filing an inmate grievance relating to this incident, but his claims for relief were denied.[22]  This litigation followed.

**STANDARD**

**I.     Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.

---

[22] On August 16, 2001, Mr. Wesley filed an initial grievance against Officer Dombroski and an "unknown officer," which described the August 6 incident in detail.  The Grievance Officer denied Mr. Wesley's claim, finding that he had created the incident because he did not receive the medical attention that he desired, and that the escorting officers did not mistreat or harm him in any way.  Mr. Wesley timely appealed that decision, which was denied on September 11, 2001.  Mr. Wesley then sought final review of his grievance, but the Chief Grievance Coordinator upheld the responses provided by the institutional officer and denied Mr. Wesley's claim.

After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.

## II.      Section 1983

Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States.  42 U.S.C. § 1983; Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000).  To state a cause of action under Section 1983, a plaintiff must show that the defendant, through conduct sanctioned under the color of state law, deprived him of a right secured by the Constitution or laws of the United States.  Gruenke, 225 F.3d at 298 (citations omitted).

## III.     Eighth Amendment – Excessive Force

"After conviction, the Eighth Amendment serves as the primary source of substantive protection in cases when an inmate challenges a prison official's use of force as excessive and unjustified."  Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000); see Whitley v. Albers, 475 U.S. 312, 327 (1986).  In particular, the Eighth Amendment protects inmates from the "wanton and unnecessary infliction of pain."  Fuentes v. Wagner, 206 F.3d 335, 344 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 319 (citations and internal quotations omitted)).  "[N]ot every governmental

15

action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Fuentes, 206 F.3d at 344 (citing Whitley, 475 U.S. at 319); see also Hudson v. McMillian, 503 U.S. 1, 9-10 (1992) ("That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action."); Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."). That is, the Eighth Amendment proscription of "cruel and unusual" punishment typically does not extend to de minimis uses of force. Generally, conduct that reaches the level of cruel and unusual punishment is "repugnant to the conscience of mankind" and "inconsistent with contemporary standards of decency." Whitley, 475 U.S. at 327 (quoting Estelle v. Gamble, 429 U.S. 97, 103, 106 (1976)).

The "pivotal inquiry" in examining an inmate's excessive force claim under Section 1983 is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Smith v. Mensinger, 293 F.3d 641, 649 (3d Cir. 2002); see Brooks, 204 F.3d at 106 (quoting Hudson, 503 U.S. at 7). In Whitley, the Supreme Court articulated the following factors to guide this inquiry, including: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." 475 U.S. at 321.

When examining Eighth Amendment excessive force cases, courts generally afford prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are necessary to preserve internal order and discipline and to maintain

16

institutional security." Whitley, 475 U.S. at 321-22 (quoting Bell v. Wolfish, 441 U.S. 520, 547 (1979)). "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates," as well as to "prophylactic or preventive measures intended to reduce the incidence of these or any breaches of prison discipline." Whitley, 475 U.S. at 322. While such deference "does not insulate from review actions taken in bad faith and for no legitimate purpose, it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." Id.

**DISCUSSION**

The Court must determine if, when viewing the facts in the light most favorable to Mr. Wesley, a reasonable jury could conclude by preponderance of the evidence that the Defendants used force with the malicious or sadistic intent to harm Mr. Wesley. The facts are undisputed that Defendants applied at least some force in transporting Mr. Wesley from the Graterford dispensary back to his cell. The parties dispute the extent of force used by the Defendants, Defendants' reasonably perceived need to apply force, and the extent of Mr. Wesley's injuries.

In support of their motion for summary judgment, the Defendants argue that they employed only the minimal force necessary to temper a potentially volatile situation, protect the safety of other persons in the dispensary, and cause the least amount of injury to Mr. Wesley. Mr. Wesley claims a violation of his Eighth Amendment right to be free from cruel and unusual punishment. To analyze Mr. Wesley's claims coherently, the Court will divide Mr. Wesley's escort into four stages – (1) from the dispensary to the main corridor; (2) from the main corridor to the loading dock; (3) from the loading dock to the van; and (4) from the van to his cell – and assess the force used and the need for force with respect to each stage.

17

**A.     The Extent of Force Used and the Need for Force**

As an initial matter, Mr. Wesley contends that because he was chronically ill, undergoing exhausting treatment, weak, exhausted, older and in poorer condition than either Officer Dombroski or Officer Adolfson, and because his arms were handcuffed behind his back throughout the entire incident, "[n]o reasonable prison official could have perceived [him] to be a threat" (Pl. Mem. Opp'n 26), and any use of force was "totally unjustified."  (Pl. Mem. Opp'n 24.)  In essence, he argues that he did not pose a threat during any of the "stages" of this incident, and, therefore, that <u>any</u> use of force by the Defendants was excessive and violates the Eighth Amendment.

1.     *Stage 1 – Dispensary to the main corridor*

Mr. Wesley objects to the manner in which the Defendants forcefully picked him up and dragged him from the dispensary to the main corridor.

It is undisputed that extra precautionary measures are in place at Graterford that are specifically intended to minimize the time an RHU inmate spends in the dispensary.  As an inmate with extensive medical ailments, who was enrolled in Graterford's chronic care clinic, and who frequently received medical treatment during the course of his confinement, Mr. Wesley was familiar with Graterford's medical facilities, and its policies and procedures for providing medical treatment to inmates, including those who are housed in the RHU.  It is undisputed that on August 6, 2001, after Mr. Wesley's pulmonary examination had concluded, (1) he had no other scheduled appointments on that day; (2) even though he knew that he had no further appointments on August 6, he attempted to make an "onsite emergency complaint" to address his stomach pain and other internal ailments; and (3) he continued to vociferously plead for medical

18

attention for several minutes after his pulmonary appointment ended.

It is also undisputed that the Defendants issued several orders for Mr. Wesley to stand and attempted to persuade him to depart the dispensary on his own before they resorted to using force.

As for the force employed by Defendants, when Mr. Wesley did not stand when ordered to do so, the Defendants placed their hands beneath his armpits and lifted him to his feet. The Defendants then dragged Mr. Wesley approximately 25 feet to the main corridor. It is undisputed that the Defendants did not strike, assault or physically abuse Mr. Wesley in anyway, other than picking him up out of his chair and removing him from the dispensary against his will.

2.     *Stage 2 – Main corridor to loading dock*

As to this stage of the escort, Mr. Wesley objects to the manner in which the Defendants, aided by additional corrections officers, carried him from the main corridor to the loading dock. He also objects to being "dropped" onto the concrete surface of the loading dock.[23]

It stands to reason that because the dispensary is considered a "heightened" security area, then the main corridor of the prison – where medical instruments are not available and fewer civilian staff are present – would require a lesser degree of security. Therefore, once the Defendants had removed Mr. Wesley from the high-security dispensary, the risks to other inmates and staff presumably decreased.

However, it is undisputed that Mr. Wesley intended to create, and did create, a

---

[23] Mr. Wesley also appears to claim that an unidentified corrections officer stepped on his ankle during the commotion that ensued when several officers responded to transport Mr. Wesley to the loading dock. However, because Mr. Wesley does not claim that either of the Defendants was the individual who stepped on his ankle, that specific conduct is not at issue here. (Wesley Dep. 66:17-20, 70:23-71:3.)

disturbance in the main administrative corridor.  At his deposition, Mr. Wesley's testified that he

expected that several corrections officers would be congregating in the main corridor.  Once he

saw that other corrections officers in fact were present in the main corridor, Mr. Wesley testified

that he fell to his knees and began "screaming and hollering, help, help, help."  (Wesley Dep.

63:12-14.)  Mr. Wesley made so much noise that as many as six other corrections officers "came

running to the scene."  (Wesley Dep. 63:23-64:2.)

     Defendants again resorted to using force in response to Mr. Wesley's defiant and

emotional behavior.  Upon the occurrence of Mr. Wesley's outbreak, the Defendants and the

other officers picked him up off the ground, each officer carrying him by one of his limbs.  The

officers holding Mr. Wesley's arms carried him by slipping their arms through the crook of his

elbows, while the officers supporting Mr. Wesley's legs held onto his knees or ankles.  The

Defendants and the other officers then carried Mr. Wesley to the loading dock using the four-on-

one technique.[24]

---

[24] The specific means employed by Defendants to carry Mr. Wesley is a major contention among the parties.  Mr. Wesley asserts that the Defendants and the two unidentified corrections officers "hog-tie" carried him.  (Wesley Dep. 67:12.)  Conversely, the Defendants, argue that hog-tying specifically refers to "the practice of handcuffing an inmate behind the back, placing leg irons on him, and drawing the inmate's hands and feet within a few inches of each other by use of a chain between the handcuffs and leg irons."  Sims v. Greenville County, No. 99-1732, 2000 U.S. App. LEXIS 6846, at *5 n.1 (4th Cir. Apr. 14, 2000) (unpublished).

     Incorporating this definition of "hog-tying" for purposes of determining this motion, the record does not indicate that the Defendants ever carried Mr. Wesley technically in a "hog-tie" fashion.  At no point did the Defendants place leg irons on Mr. Wesley, tie his hands and feet together, or draw his feet towards his hands.  As previously stated, Mr. Wesley had his wrists handcuffed behind his back, and the Defendants, aided by additional corrections officers, carried him using a "four-on-one" approach, whereby four corrections officers each held one of Mr. Wesley's limbs.  This technique is specifically mandated by the institution for transporting resistant inmates.  (See Dombroski Dep. 41:5-11.)  Beyond the terminology used, the parties essentially agree as to the physical description of how Mr. Wesley was carried.

The Defendants and the other officers then "dropped" Mr. Wesley onto the loading dock. In his brief, Mr. Wesley argues that the Defendants "sadistically and maliciously" dropped him "face first" onto the concrete surface of the loading dock.  (Pl. Mem. Opp'n 25.)  The Defendants respond that the record contains no evidence that Mr. Wesley fell face-first, as he testified to being dropped "face-down" onto his torso.  Specifically, Mr. Wesley testified that the Defendants and the other officers "dropped" him, or "let go of [him] facedown on the concrete dock," "[r]ight on [his] torso."  (Wesley Dep. 67:24-68:3.)  In the grievance that he filed shortly after the incident, Mr. Wesley claimed that the officers dropped him on his stomach (Pl. Mem. Opp'n Ex. G at 2.), and in his Complaint in this Court, he alleged that he was dropped on his "belly" and stomach.  (Compl. 14 ¶ 22.)

Defendants argue that the record does not support any claim that the Defendants and the other corrections officers acted in concert and deliberately dropped Mr. Wesley's 190 pound body intending to harm him.  At his deposition, Mr. Wesley did not indicate whether he thought that the Defendants intended to inflict paid by dropping him on the concrete ground, or whether they intended to drop him at all, as opposed to merely setting him down.  Mr. Wesley does not specifically state whether the four corrections officers who carried him, each of whom held one of his limbs, dropped him at the same time or in a coordinated fashion, to suggest that the two additional officers subscribed to the allegedly malicious and wilful intent of the Defendants to inflict pain and punishment upon Mr. Wesley.  Mr. Wesley does not allege that the Defendants or the other officers said anything to him at this stage that would indicate that they intended to harm him by dropping him on the pavement, or that the officers, including the Defendants, took any further actions while he was on the ground that would indicate an intent to inflict pain.

3.      *Stage 3 – Loading dock to van*

With respect to this stage, Mr. Wesley objects to being picked up roughly from the loading dock and roughly carried approximately 100 feet to an awaiting van.[25]  The Defendants contend that they carried him using the four-man approach they previously had employed when carrying him from the main corridor out to the loading dock.

During the time Mr. Wesley was laying on the concrete surface, even after he spit on Officer Dombroski's pant leg and shoe, the Defendants did not hit, kick or harm Mr. Wesley in any way.  Defendants only employed physical force in order to pick up and carry Mr. Wesley to the awaiting van.

4.      *Stage 4 – Van to cell*

Finally, Mr. Wesley objects to being roughly "tossed" face-down onto the cushioned seat of the prison van, and having a corrections officer – he claims it was Officers Adolfson – apply pressure to the small of his back and the back of his neck.  Defendants argue that because Mr. Wesley had caused a disruption in the main corridor, and had then spit on Officer Dombroski's leg on the loading dock, at this stage of the escort it was appropriate to place him face down on the seat of the van – given that he was handcuffed behind his back – and to secure him by placing pressure on his back.  (Def. Mem. Summ. J. 15.)  The Court notes that this would have also prevented Mr. Wesley from falling off the van seat as the vehicle transported him.

Once the van reached the RHU, Mr. Wesley objects to the officers using the "same four point restraint, two on the arms, two at the legs" to remove him from the van and place him on

---

[25] Mr. Wesley alleges that four corrections officers "picked me back up off of the dock, carried me down of the dock, down the ramp about 100 feet down the . . . gravel road" to the approaching van.  (Wesley Dep. 70:3-5.)

the ground.  (Wesley Dep. 72:3-8.)  Mr. Wesley does not claim that any further abusive treatment occurred once he was placed on his feet after the van reached the RHU.

**B.     Mr. Wesley's Alleged Injuries**

The Defendants argue that Mr. Wesley's allegedly injuries are, at best, <u>de</u> <u>minimis</u>, and preclude him from stating a viable Eighth Amendment claim.  However, it is well established in this circuit that while the "absence of objective proof of non-de minimis injury does not alone warrant dismissal," a plaintiff's injuries, although not dispositive, are relevant to determining if excessive force was used against a plaintiff.  <u>Brooks</u>, 204 F.3d at 108.  When examining the extent of the injury inflicted upon an inmate pleading excessive force, the Court's analysis must be driven by "the extent of the force used and the circumstances in which it is applied; not by the resulting injuries."  <u>Smith</u>, 293 F.3d at 648.  The rationale for examining the force employed instead of the injuries suffered is that requiring objective proof of injury would place protection from injury, rather than protection from wanton force, at the hub of the Eighth Amendment. <u>Brooks</u>, 204 F.3d at 108.  Nonetheless, consideration of the injury can help to ascertain force.

There is no extrinsic evidence that the Defendants' actions caused any injury to Mr. Wesley.  The only evidence of any injuries Mr. Wesley may have suffered as a result of the Defendants' conduct is his own testimony.[26]  Mr. Wesley claims to have suffered reddened

---

[26] The Court is mindful of the Court of Appeals' common sense instruction that, when focusing on the injuries an inmate has allegedly suffered, the Court must recognize that an inmate "is in a decidedly difficult position from which to generate 'record evidence' on his behalf." <u>Brooks</u>, 204 F.3d at 108 n.7 (<u>quoting</u> <u>Norman v. Taylor</u>, 25 F3d 1259, 1265 (4th Cir. 1994) (Hall, J., dissenting).   The <u>Brooks</u> court noted that "Brooks cannot seek independent medical advice from a specialist or his personal physician to corroborate his allegations regarding his injuries," and that his testimony is likely the best that can be expected at the summary judgment phase.  <u>Id.</u> The <u>Brooks</u> court's decision was in the context of an inmate who was proceeding <u>pro</u> <u>se</u>, in contrast to Mr. Wesley, who is now represented by counsel.  However, the Court notes that Mr.

armpits, a swollen ankle, and soreness in his back, neck, shoulder, waist and hip as a result of

Defendants' conduct.  Mr. Wesley testified that he refused medical treatment upon returning to

his cell following the August 6 incident, never sought medical attention as a result of any injuries

he may have suffered as a result of Defendants' conduct on that day; he never registered a sick

call to address his alleged injuries, and did not report his injuries to the doctor who examined

him a few days after the incident.[27]  Instead, he testified that he nursed his injuries with "rest."

(Wesley Dep. 77:21-24.)

     Mr. Wesley's alleged injuries are consistent with his and the Defendants' recitations of

the events that occurred on August 6, 2001.  The pain beneath his armpits and in his upper body

and his torso, could well have resulted from the manner in which he was carried; pain in his hip

---

Wesley was not represented by counsel until April 2006, which is more than four and a half years
after the incident in question, and more than three years after Mr. Wesley initiated this lawsuit.

     The Court also notes that, although it is not reasonable to expect an inmate in Mr.
Wesley's position to consult a "personal physician" in order to corroborate his alleged injuries, it
is not unreasonable to expect an inmate who has been seriously injured at least to seek medical
attention following an incident such as this one.  If Mr. Wesley was too frightened at least to seek
treatment immediately after the August 6 incident, then, alternatively, he could have registered a
sick call and requested that a physician's assistant visit him in his cell.  He also could have
reported his injuries to the physician who did examine him shortly after the August 6 incident.
Had Mr. Wesley ever sought medical attention in the wake of this incident, there could have been
corroborating evidence of his injuries available for use in this proceeding.  That Mr. Wesley
refused to pursue treatment following this incident, when he admits he was asked if he wanted
any, that he never sought treatment thereafter for his alleged injuries, even though his
background indicates that he was certainly no stranger in Graterford's dispensary, and his
requests-for-medical-attention, are relevant to the Court's present inquiry.

    [27] In his brief, Mr. Wesley states that although he never mentioned his injuries to the
medical staff at Graterford, he documented his injuries in his August 14, 2001 grievance, which
is part of the record in this case.  However, the Court notes while Mr. Wesley's grievance
certainly describes the <u>pain</u> that he allegedly suffered at the hands of the Defendants while the
August 6 incident ensued, he does not describe any resulting temporary, permanent, debilitating
or even minor injuries in the August 14 grievance.  (<u>See</u> Pl. Mem. Opp'n 26; Pl. Mem. Opp'n
Ex. G.)

area could have resulted from being dropped on the loading dock; and pain in proximity to his

back could have resulted from having pressure applied while he lay face-down on the seat of the

van.

### C.    The Extent of the Threat to the Safety of Staff and Inmates

In light of Mr. Wesley's age and medical condition, he may not have posed a serious

physical threat to the Defendants.  However, Mr. Wesley is an inmate incarcerated in a maximum

security facility, and at the time of this incident, he was confined to the RHU, an even more

restrictive, heightened-security environment.  Not surprisingly, Graterford employs extra

precautionary measures in handling RHU inmates.  Despite Mr. Wesley's weakened condition,

these "extra precautionary measures" applied to him, as they apply to all RHU inmates at

Graterford.

 The fact that Mr. Wesley was handcuffed throughout the incident is certainly relevant to

the question of whether Mr. Wesley posed a threat, and ultimately to the question of whether

force was necessary in dealing with him.  Certainly, not much more than minimal force would be

necessary to restrain a middle-aged, ill, weak inmate whose arms are handcuffed behind his back.

Mr. Wesley fails to acknowledge that although he personally may not have posed a

physical threat to the corrections officers, his admittedly animated conduct and apparently

outward defiance of Officer Dombroski's orders could have incited nearby inmates to initiate a

disruption.[28]  If such unrest were to ensue, it significantly would have jeopardized the already

---

[28] Officer Dombroski testified that "countless" other inmates were present while Mr.
Wesley was seated outside the doctors' offices, and that he was concerned about their safety.
(Dombroski Dep. 110:5-11.)  He also testified that he personally felt threatened when Mr.
Wesley began struggling with his arms, kicking his feet, and when Mr. Wesley spit on his pant
leg.  (Dombroski Dep. 112:15-19.)

limited safety experienced by Graterford corrections officers and staff.  Although the threat Mr.
Wesley himself posed to the safety of Defendants, Graterford's medical staff, and nearby inmates
varied throughout his escort, Mr. Wesley's emotional conduct jeopardized the security of those
around him.  Consequently, the fact that Mr. Wesley himself posed little threat to the Defendants
should not overshadow the possibility that his potential incitement of nearby inmates could have
compromised Graterford's security immensely.

### D.    The Efforts, if any, Made to Temper the Severity of the Forceful Response

Mr. Wesley appears to argue that the Defendants did not exhaust their non-forceful
alternatives to limit the severity of their escort, and that prison officials must resort to force only
after successfully exhausting alternative remedies or when no alternative remedies exist.  In his
brief, he claims that had the Defendants provided him with a wheelchair when he first requested
one in the dispensary, no force would have been necessary and the unfortunate events of August
6 could have been avoided entirely.  Defendants argue that refusing to provide an inmate a
wheelchair upon request, does not constitute "cruel and unusual" punishment, and that they only
applied the minimal amount of force required under the circumstances.[29]  Furthermore,
Defendants reiterate their claim that they only resorted to applying force after issuing orders to
Mr. Wesley which Mr. Wesley refused to obey.

### E.    Analysis

Viewing the evidence in the light most favorable to Mr. Wesley, as the Court must, Mr.

---

[29]  The Court notes that, up to this point on August 6, Mr. Wesley had expressed no
difficulty walking.  Mr. Wesley had walked almost a quarter-mile from the RHU to the
dispensary, and failed to mention any leg pain or heaviness to the physician who examined him,
Nurse Beauchesne, or the Defendants.  Indeed, as described by Mr. Wesley, he expressed his
inability to stand only when Officer Dombroski ordered him to exit the dispensary.

Wesley suffered minor injuries that resulted from force applied by Defendants in grabbing, picking up, dragging, dropping and carrying Mr. Wesley while taking him from the Graterford dispensary back to his cell.  The Court must determine whether Mr. Wesley has adduced sufficient evidence to permit a reasonable jury to find in his favor.

As noted above, the Court may grant a considerable amount of deference to the considered choices made by prison officials in carrying out their duties.  Each use of force described by Mr. Wesley occurred while the Defendants were carrying out their official duties, namely, to escort an RHU inmate to and from the prison dispensary.  In other words, this is not a case where the defendants prison guards engaged in an unauthorized, extraneous use of force that is inconsistent with any "good-faith effort to maintain or restore discipline," Smith, 293 F.3d at 649, or "to maintain institutional security."  Whitley, 475 U.S. at 321-22 (quoting Bell, 441 U.S. at 547.  In the Eighth Amendment context, there is a distinction between corrections officers' effort to maintain order and a "malicious and sadistic" use of force intended to inflict wanton and unnecessary pain upon an inmate.

The Court finds that the Defendants' actions towards Mr. Wesley on August 6, 2001 do not amount to excessive force in violation of the Eighth Amendment.  Under the circumstances described by Mr. Wesley, the Defendants did not target Mr. Wesley; rather they were assigned to escort him to and from the dispensary for a scheduled appointment.  They reasonably perceived a need to apply force, and the amount of force that they used was reasonable.  When viewed in the context in which each use of force occurred, including Mr. Wesley's own behavior, the

Defendants' actions lack the severity necessary to exceed the de minimis category.[30]  Put

differently, although Mr. Wesley often uses colorful and incendiary language in characterizing

the Defendants' actions, Defendants' actions cannot fairly be described as "malicious and

sadistic" use of force that is "repugnant to the conscience of mankind."  Whitley, 475 U.S. at 327

(quoting Estelle, 429 U.S. at 106).

      Mr. Wesley relies heavily on two opinions rendered by the Third Circuit Court of

Appeals, both of which involved a plaintiff who suffered, or could prove, only minimal injuries,

but who claimed that prison corrections officers savagely and gratuitously beat them.  See

Brooks, 204 F.3d at 104; Smith, 293 F.3d at 644.  In both cases, the Court of Appeals reversed a

summary judgment ruling in favor of the defendants.  In Brooks, the plaintiff alleged that the

defendant corrections officers repeatedly punched him while he was standing up and after he fell

to the ground, stomped on his back and neck, placed him in leg shackles, raised him four feet

---

      [30] Courts have found only de minimis use of force and no constitutional violation when an
inmate was pushed into a poll, pushed and kicked in the back, punched several times and pushed
to the ground, Thomas v. Ferguson, 361 F. Supp. 2d 435, 440 (D.N.J. 2004), when defendant,
after reasonably perceiving that plaintiff had been sexually inappropriate, handcuffed and pushed
him in an effort to return him to his cell, Smith v. Horn, No. 00-04023, 2004 U.S. Dist. LEXIS
11306, at *6-8 (E.D. Pa. Mar. 23, 2004), when defendant pulled sharply on plaintiff inmate's
arms, which were handcuffed behind his back, and slammed him into the wall for no apparent
reason, Acosta v. McGrady, No. 96-2874, 1999 U.S. Dist. LEXIS 3191, at *26-29 (E.D. Pa. Mar.
22, 1999), when defendant intentionally "slammed" the inmate's cell door into his chest,
aggravating pre-existing neck and back injuries, Colon v. Wert, No. 96-4494, 1997 U.S. Dist.
LEXIS 3413 (E.D. Pa. March 21, 1997), when defendants pulled a chair out from under inmate,
causing him to fall and suffer loose teeth, Barber v. Grow, 929 F. Supp. 820 (E.D. Pa. 1996),
when inmate was handcuffed, dragged along corridor, and hit in the back, Robinson v. Link, No.
92-4877, 1994 U.S. Dist. LEXIS 11950 (E.D. Pa. Aug. 25, 1994), and when defendant struck
inmate in the chest and spit on him, Brown v. Vaughn, No. 91-2911, 1992 U.S. Dist. LEXIS
4221 (E.D. Pa. March 31, 1992).  The Court refers to these cases not to suggest that such conduct
– much of which appeared to be gratuitous and hardly what one who did not provoke it would
want to experience – is routinely appropriate within the confines of a correctional institution, but
rather to provide a context of case law for evaluating this claim.

from the floor and slammed him into a cell wall, choked him and threatened to kill him.  204

F.3d at 104.  In <u>Smith</u>, the plaintiff claimed that defendant corrections officers rammed his head

into walls and cabinets, knocked him to the floor, punched and kicked him when he was on the

floor, pushed him against the wall and choked him with both hands.  293 F.3d at 644.

      In comparison, Mr. Wesley's allegations are relatively mild.  In contrast to the claims in

<u>Brooks</u> and <u>Smith</u>, Mr. Wesley was not punched, kicked, choked, or pushed in any abusive

manner.  Furthermore, although not determinative of whether Mr. Wesley can ultimately state a

viable excessive force claim, it is certainly relevant that his alleged injuries, which amount to no

more than bruises that healed with "rest," were minor.  When Defendants first applied force in

the Graterford dispensary in order to pick up Mr. Wesley, stand him onto his feet, and transport

him to the main corridor, such force was used only after Mr. Wesley refused several orders to

stand and depart under his own power.[31]  The Graterford dispensary operates under the most

heightened security, and the Defendants were entitled to see Mr. Wesley as improperly

attempting to extend his stay in the dispensary.  Graterford's "extra precautionary measures" are

intended to address precisely this situation, and require that corrections officers return an RHU

inmate to his cell immediately following his appointment.  In light of these facts, it was

reasonable for the Defendants to perceive an immediate need to remove Mr. Wesley from the

---

[31] The Defendants first attempted to remove Mr. Wesley from the dispensary without any
force, as Officer Dombroski verbally ordered Mr. Wesley to rise from his chair.  Only after Mr.
Wesley remained seated did the Defendants grab Mr. Wesley beneath his armpits, one officer on
each side, and pull him to his feet.  Again, Officer Dombroski issued more merely verbal orders
to stand, and afforded Mr. Wesley the opportunity to leave the infirmary without the Defendants'
assistance.  However, Mr. Wesley continued to refuse, and the Defendants, placing  their hands
under each of Mr. Wesley's arms, dragged him approximately 25 feet into the main corridor.  As
described, Mr. Wesley could have brought the "dragging" to an end by at least trying to engage
his feet and legs to demonstrate some level of cooperation.

dispensary.  Because Mr. Wesley claimed that he could not stand or walk, it was reasonable for the Defendants to apply force to physically remove him.[32]  None of this event, as described, conjures up a picture of Defendants demonstrating vicious, malicious, mean or abusive conduct to subject Mr. Wesley to either cruel or unusual punishment.

Similarly, when Defendants carried Mr. Wesley into the main corridor, Defendants applied force in response to Mr. Wesley's emotional outburst.[33]  Mr. Wesley's actions in the main corridor were premeditated, intentional, and were deliberately designed to attract as much attention as possible.  Mr. Wesley concedes that his emotional conduct did, in fact, attract considerable attention.  Thus, it was reasonable for the Defendants to apply force to transport Mr. Wesley from the main corridor to the loading dock, away from the view and presence of other inmates, to a secure, outdoor area.

Furthermore, each of the Defendants' uses of force was <u>de minimis</u>.  Defendants applied

---

[32]  Whether Mr. Wesley could not physically stand and walk, or whether he simply refused to walk when he was ordered by Officer Dombroski to do so, is a disputed issue of fact. However, adopting Mr. Wesley's view of the facts, namely, that he was too weak to walk, the Court finds that there was a need to apply force in order to move Mr. Wesley, and that the minimal force applied by the Defendants in removing Mr. Wesley from the dispensary was not excessive.  As noted above, the dispensary itself is a heightened security area, and Graterford procedures mandate that corrections officers escort RHU inmates back to the RHU immediately after the inmate's medical examination ends.  It is important to note that Mr. Wesley voluntarily had walked a quarter-mile from his cell to the dispensary, communicated no leg-related trouble either while walking to the dispensary, or speaking with medical personnel or the Defendants, and proclaimed an inability to walk only upon Officer Dombroski's order to leave the dispensary. Even if Defendants were mistaken in their belief that Mr. Wesley was faking his inability to walk, it was reasonable to apply a minimal amount of force to remove Mr. Wesley from the dispensary immediately after he began to cause a disruption.

[33] Even though the Defendants had removed Mr. Wesley from the high-security dispensary, and, therefore, presumably lessened the risks that previously had existed, it was not until the Defendants and Mr. Wesley had reached the main corridor that Mr. Wesley began "screaming and hollering, help, help, help."  (Wesley Dep. 63:12-13.)

force to raise Mr. Wesley from the seated position, by grabbing him beneath the armpits and

hoisting him to his feet, and "dragging" him a distance of approximately 25 feet.  Again, given

that he wore no leg-irons, Mr. Wesley could have ended the dragging by showing some effort to

start to walk on his own power.  Defendants then carried Mr. Wesley an undetermined distance

to the loading dock, where he was placed on the concrete surface, before Defendants again

picked him and carried him approximately another 100 feet to an awaiting van.  In the van,

Defendants applied pressure to Mr. Wesley's neck and back.[34]

    Under the circumstances described by Mr. Wesley, being picked up from seated position,

or picked up while laying face-down, and being carried using the "four-on-one" method, does

not constitute excessive force.  Mr. Wesley heavily relies on the incendiary terminology "hog tie"

in describing the method by which he was carried.  However, nowhere does the record suggest

that the Defendants deviated from the "four-on-one" approach, a law-enforcement technique used

at Graterford for carrying a resistant inmate, which is intended to inflict the least amount of harm

on the inmate.[35]

    In addition, the act of dropping Mr. Wesley face-down onto a concrete surface from a foot

off the ground is not severe enough to escape the de minimis description.  Although the Court by

---

[34] There is evidence, disputed by the Defendants, that Officer Dombroski threatened to
drag Mr. Wesley back to the RHU if he resisted, but that threat, especially in light of the minimal
force that followed, does not indicate a "sadistic and malicious" intent to harm Mr. Wesley.

[35] It bears mentioning that Mr. Wesley only used the word "hog-tie" once during his
deposition, when he was describing how the Defendants, aided by additional corrections officers,
carried him from the main corridor to the loading dock.  (Wesley Dep. 67:12.)  Mr. Wesley's
counsel, earnestly undertaking an advocate's duty, appear to have seized upon this term in
opposing summary judgment as the word "hog-tie" appears 16 times in Mr. Wesley's legal
memorandum.

no means endorses prison officials releasing a handcuffed inmate from roughly twelve inches off of the ground and allowing him to fall on his torso onto a concrete surface, this specific act is ultimately too insignificant to constitute the malicious and sadistic infliction of force necessary to establish an Eighth Amendment violation. As discussed above, there is no evidence that Defendants intended harm Mr. Wesley by releasing from their grip, or intended to "drop" him all at once.[36]

Finally, Mr. Wesley's allegation that the Defendants "tossed" him face-down onto a seat in a prison van, pressed his face into the seat cushion, placed a knee into his back, and pressed his face into the seat cushion, also falls within the de minimis category. Mr. Wesley appears to argue correctly that placing an inmate on his stomach while his hands are handcuffed behind his back violates DOC protocol. However, that Defendants may have employed an unsanctioned use of force, does not mean that the force applied constitutes a violation of the Eighth Amendment's prohibition of cruel and unusual punishment. While tossing Mr. Wesley face-down into a van while he was handcuffed behind his back may not be the wisest or most efficient way to transport a resistant inmate, once he was in that position, making sure he did not roll off the seat seems advisable. In any event, this conduct falls short of the requisite display of "malice for the very purpose of causing harm," for Eighth Amendment purposes. Brooks, 204 F.3d at 109.

Because a disturbance in the vicinity of dispensary could create considerable danger to other inmates and Graterford's staff, including doctors, nurses and staff employed in the

---

[36] Furthermore, of the injuries that Mr. Wesley claims to have suffered, only the pain in the waist area or the hip is consistent with being dropped torso-first onto the ground. Had the Defendants and other correctional officers intentionally dropped Mr. Wesley to the ground "face first," as he claims in his brief, one might expect that Mr. Wesley would have complained of injuries to his face, head, chest or stomach, none of which he described at his deposition.

dispensary, some force was necessary in order to quell Mr. Wesley's disruption as quickly as possible.  Even though Mr. Wesley may not have been a dangerous physical threat to the Defendants or other civilians present, it was reasonable for the Defendants to resort to force to remove Mr. Wesley and avoid a potential disruption.  Mr. Wesley caused a disturbance and resisted being transported peacefully.  Under these circumstances, it was reasonable for the Defendants to enlist assistance from other corrections officers in order to forcefully remove Mr. Wesley from the main corridor and deliver him back to his cell. The Defendants' decision to resort to force under these circumstances reflects a "considered choice" that is worthy of deference, even if not unreserved endorsement.  See Whitley, 475 U.S. at 322.

There is no evidence that the Defendants, or any other corrections officer, hit, punched, slapped, kicked, or physically abused Mr. Wesley during this escort.  Mr. Wesley mainly argues that he was picked up against his will and carried roughly.  Allegations of this type of force are insufficient to forestall summary judgment.  Defendants' use of force was minimal and not objectively unreasonable under the circumstances.

## CONCLUSION

For the reasons provided above, the Court finds that Mr. Wesley has not offered sufficient evidence to permit a reasonable jury to find in his favor.  As discussed, the injuries of which Mr. Wesley complains are relatively minor, and none of the Defendants's behavior suggests an intent to unreasonably harm Mr. Wesley.  In sum, the evidence Mr. Wesley has adduced is insufficient to meet the strict standard for "cruel and unusual punishment" under the Eighth Amendment.[37]

---

[37] The Defendants raised qualified immunity as an affirmative defense in this case. For a plaintiff to prevail in a Section 1983 action against a government official performing discretionary functions, the defense of qualified immunity requires that the Court find that the

Therefore, summary judgment will be granted for the Defendants.

S/Gene E.K. Pratter
Gene E.K. Pratter
United States District Judge

official violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Conn v. Gabbert, 526 U.S. 286, 290 (1999) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Court must determine (1) whether the plaintiff has alleged the deprivation of an actual constitutional right and, if so, (2) whether that right was clearly established at the time of the alleged violation.  Conn, 526 U.S. at 290.  A court must resolve the substantive constitutional issue before addressing qualified immunity. See Saucier v. Katz, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").  Because the Court has determined that the Defendants actions do not constitute excessive force, the Court need not consider Defendants' qualified immunity defense.  Thomas v. Ferguson, 361 F.Supp.2d 435, 442 n.6 (D.N.J. 2004).

34

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RONALD WESLEY, | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| JASON DOMBROWSKI,  and | : | |
| DANIEL ADOLFSON, | : | |
| **Defendants.** | : | No.  03-4137 |

**O R D E R**

AND NOW, this 31st day of August, 2007, upon consideration of the Motion for

Summary Judgment filed by Defendants Jason Dombroski and Daniel Adolfson (Docket Nos. 49,

50), Plaintiff Ronald Wesley's memorandum in opposition thereto (Docket No. 51, 52),

Defendants' reply brief (Docket No. 53), and Plaintiff's surreply brief (Docket No. 54), and

counsel's admirable oral advocacy on behalf of their respective clients, **IT IS ORDERED** that:

1.      Defendants' Motion for Summary Judgment (Docket Nos. 49, 50) is **GRANTED**.

2.      Judgment is entered **IN FAVOR OF** Defendants and **AGAINST** Plaintiff.

3.      The Clerk of the Court shall mark this case **CLOSED** for all purposes, including

statistics.

BY THE COURT:


S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge